### Replacement of Canceled Insurance

UMSTED, Deputy Attorney General, September 17, 1948.—You have requested our opinion concerning an

interpretation of subsection (g) of section 17 of the Motor Vehicle Sales Finance Act of June 28, 1947, P. L. 1110, 69 PS §601 et seq., as it applies to the cost of replacing policies of fire, theft, and collision insurance written by the Paramount Mutual Insurance Company, on motor vehicles sold by certain dealers and financed through various finance companies and banks licensed to do business under that act.

The Paramount Mutual Insurance Company was dissolved and an order of liquidation entered December 3, 1947, by the Court of Common Pleas of Dauphin County as of no. 256, Commonwealth Docket, 1947.

The legal effect of the dissolution was automatically to cancel all outstanding policies of the dissolved corporation: Commonwealth ex rel. v. Guardian Fire Insurance Co. of Pennsylvania (No. 1), 65 Pa. Superior Ct. 203, 205 (1916). And the specific question now arises whether its existing policies of insurance on financed motor vehicles at that date were canceled "by the insurance company prior to expiration", within the meaning of subsection (g) of section 17 of the Motor Vehicle Sales Finance Act, 69 PS §617. The act became effective under its terms August 27, 1947, and section 17(g) reads as follows:

"*When the seller contracts to purchase insurance at the buyer's expense and such insurance is cancelled by the insurance company prior to expiration,* the seller or subsequent holder shall place comparable insurance with another insurance company and furnish the buyer with a copy of the insurance policy, subject to the same requirements of this act applicable to the original policy. In the event the holder is unable to obtain such insurance in another insurance company, he shall immediately notify the buyer, who may then obtain such insurance from an insurance company, agent or broker of his own selection and the holder shall be liable for any additional costs incurred by the buyer in rewriting such insurance for the unex-

pired period for which the original insurance was written. The holder under these circumstances shall also be liable to the buyer for any loss suffered by the buyer through negligence on the part of the holder in promptly advising the buyer of his inability to obtain replacement insurance." (Italics supplied.)

If the legal effect of dissolution of the insurer can be said to constitute a cancellation of the policy, within the meaning of the aforesaid statutory provisions, then it is clear there is a duty on the part of the dealers, or their assignees as the case may be, to pay for the fire, theft, and collision coverage necessary to supplant the coverage lost by the cancellation of existing policies.

This statement of the proposition before us very nearly in itself answers your question, because in the construction of a comprehensive statute it is presumed the legislature intended it to be effective in its entirety, and certain in its application: section 52 (2) of the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §552.

A further guide to the interpretation of section 17(g) of the Motor Vehicle Sales Finance Act is to be found in its preamble, which may legitimately be used in ascertaining intent and meaning under both sections 51 and 54 of the Statutory Construction Act, supra, 46 PS §§551 and 554. The preamble, 69 PS §602, reads as follows:

"Section 2. Findings and Declarations of Policy.— It is hereby determined and declared as a matter of legislative finding:

"(a) That an exhaustive study by the Joint State Government Commission discloses nefarious, unscrupulous and improper practices in the financing of the sale of motor vehicles in this Commonwealth which are unjustifiably detrimental to the consumer and inimical to the public welfare. Such practices prevail not only among some sellers, but also among some sales finance companies and some banks, which acquire

contracts arising out of installment sales of motor vehicles, and which frequently influence the credit policies of sellers.

"(b) That the agreement for the installment sale of motor vehicles in this Commonwealth has been generally cast in the form of the so-called 'Pennsylvania Bailment Lease' contract, in which the seller is technically the lessor, and the buyer is technically the lessee. By the use of this fictional instrument in the installment sale of motor vehicles, the extension of credit to the purchaser has been so inextricably entwined with the alleged bailment of the motor vehicle as to deprive the consumer of the benefit of existing laws.

"(c) *That consumers, because of these legal technicalities and because of their unequal bargaining position, are at the mercy of unscrupulous persons and are being intolerably exploited* in the installment purchase of motor vehicles. Such exploitation is evident in the unfair provisions of the installment sale contract, exorbitant charges for credit, extortionate default, extension, collection, repossesssion and other charges, *unconscionable practices respecting* execution of contracts, refinancing of contracts, prepayment, refunds, *insurance*, repossession and redemption.

"(d) That practices enumerated, and others equally pernicious, have existed to such an extent that regulation of the installment selling of motor vehicles is necessary to the adequate protection of the public interest. Adequate regulation of installment selling must include control of the functions of selling and financing of motor vehicles, whether exercised by the same or by different persons.

"Therefore, it is hereby declared to be the policy of the Commonwealth of Pennsylvania to promote the welfare of its inhabitants and to protect its citizens from abuses presently existing in the installment sale of motor vehicles, and to that end exercise the police power of the Commonwealth to bring under the supervision of the Commonwealth all persons engaged in the

business of extending consumer credit in conjunction with the installment sale of motor vehicles; *to establish a system of regulation for the purpose of insuring honest and efficient consumer credit service for installment purchasers of motor vehicles; and to provide the administrative machinery necessary for effective enforcement."* (Italics supplied.)

This declaration of intention by the legislature leaves no doubt that its attention was focused upon the plight of the consumer and its purpose, his protection. We do not consider it necessary in this opinion to draw extensively from the voluminous record of insurance practices by some snide finance companies and unscrupulous dealers, which were collected by the Joint State Government Commission in its study of the subject, preparatory to drafting this law. It should suffice here to refer to one practice which was prevalent, and with which those familiar with the subject should be cognizant—the practice of requiring installment purchasers of motor vehicles to pay for insurance on the vehicles, written by insurance companies from which certain dealers and finance companies, either directly or indirectly, acquired commissions or rebates.

This evil was met before. We discussed it in Insurance on Financed Motor Vehicles, 61 D. & C. 621, addressed to the Insurance Commissioner, and cite it here as cogent to the conclusion that the legislature intended to protect the consumer against duplicating premium payments where insurance cancellation occurred through no fault of his. The words, "cancelled by the insurance company prior to expiration", used in section 17 (*g*) of the act, should be accordingly construed.

Viewed from a purely common sense point, the true intent and meaning of section 17 (*g*) is even less escapable. A court order of dissolution and liquidation under section 502 of The Insurance Department Act of May 17, 1921, P. L. 789, as amended, 40 PS §202, having the legal effect of canceling outstanding insur-

ance policies, must be predicated upon commissions or omissions of the insurance company itself. In such case it may properly be concluded that by its own actions the company itself has canceled its policies.

The additional reason urged upon us for exonerating sellers and their assignees from payment for substituted insurance in these cases, that in many instances the purchaser originally constituted the dealer or subsequent holder of his paper his agent for obtaining the insurance, is without merit. Even in such instances the seller contracts to purchase insurance at buyer's expense, which meets the exact phraseology of section 17(g). The rights of assignee, finance company, or bank can rise no higher than those of the seller under the definition of "seller", supplied in paragraph 4 of section 3 of the 1947 Act.

Where, however, the buyer avails himself of the privilege which section 17(b) allows him, to purchase the insurance from his own agent or broker in a company acceptable to the seller, a different conclusion must be reached. For in such case the buyer has assumed responsibility for the stability of the insurance carrier, and, having called the tune, must pay the piper.

Subsection (b) of section 17 of the 1947 Act, reads as follows:

"The buyer of a motor vehicle under an installment sale contract shall have the privilege of purchasing such insurance from an agent or broker of his own selection and selecting an insurance company acceptable to the seller: Provided, however, The inclusion of the cost of the insurance premium in the installment sale contract, when the buyer selects the company agent or broker, shall be optional with the seller."

In the phraseology of section 17(b) no legislative intendment can be found to place obligations upon the seller other than the duty to accept the insurance of a responsible carrier selected by the buyer and the option to permit the cost of the insurance to be in-

cluded in the total payable under the installment sale contract.

If the cost of the insurance in such case is not included in the installment sale contract, it is obvious, upon the necessity of replacing the risk, arising through no fault of the seller, that the expenditure incident must be borne by the buyer. And were the rule different where the seller agreed to permit the initial insurance cost to be included in the contract, no seller would ever agree to include it.

But the words "of his own selection" as used in this subsection must be strictly construed to meet the objects of the whole law. The acceptance by the buyer of an insurance agent, broker, or carrier, in fact selected by the seller, will not suffice to shift from seller to buyer the obligation to pay for a necessary replacement of the insurance risk. "Of his own selection", means a free and unhampered selection, not one obtained by coercion of any sort.

We are of the opinion and you are accordingly advised that policies of fire, theft, and collision insurance on motor vehicles sold on time payment plans, on or after August 27, 1947, and written by Paramount Mutual Insurance Company, canceled by reason of a decree of liquidation entered against that company December 3, 1947, must be replaced at the expense of the sellers or their assignee finance companies or banks as provided in subsection (g) of section 17 of the Motor Vehicle Sales Finance Act of June 28, 1947, P. L. 1110, 69 PS §617, unless the insurance coverage was obtained by the buyer through an agent or broker or in an insurance carrier of his own free and unhampered selection, as permitted under subsection (b) of section 17 of that act. In this event the obligation would be upon the buyer of the motor vehicle to replace the canceled insurance with another insurance carrier acceptable to the seller.